IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGE SWAN and
MELISSA BELL,

               **Plaintiffs,**

      **v.**
                                **1:11-cv-1713-WSD**

NICK GROUP, INC. d/b/a
SWANSON TOWING AND
RECOVERY and SARAH CHA,

               **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Renewed Motion for Summary Judgment [41] ("Motion for Summary Judgment").

**I.    BACKGROUND**

    A.    <u>Procedural History</u>

On May 25, 2011, Plaintiffs George Swan ("Swan") and Melissa Bell ("Bell") (collectively, "Plaintiffs") filed this action against their former employers, Defendants Nick Group, Inc. d/b/a Swanson Towing and Recovery ("Nick Group") and Sarah Cha ("Cha") (collectively, "Defendants"). In their Amended Complaint [39], Plaintiffs assert claims under the Fair Labor Standards Act (the "FLSA"), alleging that they were not paid the minimum wage or overtime compensation for

certain work that they performed.  They seek, among other things, damages for unpaid wages and liquidated damages.

On October 1, 2012, Defendants filed their Motion for Summary Judgment seeking judgment in their favor on (i) Plaintiffs' overtime compensation claims on the ground that Defendants are exempt from the FLSA's overtime requirements; (ii) all claims on the ground that the record does not establish that Plaintiffs were denied minimum wage or worked more than forty hours per week; and (iii) Plaintiffs' claims that accrued more than two years before the filing of this action and Plaintiffs' claims for liquidated damages.

B.   <u>Facts</u>[1]

Nick Group is a towing business located in Henry County, Georgia.  (Pls.'
Resp. Defs.' SUMF [42-1] ¶ 1.)  Cha co-owns and manages Nick Group.  (<u>Id.</u> ¶ 2.)

1.   *Bell's Employment*

From August 2006 to October 2009, Bell was a night dispatcher for Nick
Group.  (<u>Id.</u> ¶ 7.)  She worked at least five nights per week, from 7:00 or 7:30 p.m.
to 7:00 or 7:30 a.m., and was paid $390 per week.[2]  (<u>See id.</u>)  Bell's job consisted

---

[1] These facts are taken from the following statements of facts submitted in
accordance with Local Civil Rule 56.1: Defendants' Statement of Material Facts
[41-1] ("Defs.' SUMF"), Plaintiffs' Response to Defs.' SUMF [42-1] ("Pls.' Resp.
Defs.' SUMF"), Plaintiffs' Statement of Additional Material Facts [42-2] ("Pls.'
SAMF"), and Defendants' Response to Pls.' SAMF [44] ("Defs.' Resp. Pls.'
SAMF").  Where a party disputed a factual assertion contained in a statement of
facts, the Court also considered the specific exhibits cited in support of the
assertion.  <u>See</u> L.R. 56.1(B)(3), NDGa (providing that the court deems a party's
SUMF citation as supportive of the asserted fact "unless the respondent
specifically informs the court to the contrary in the response").  Defendants, the
moving parties, made numerous factual assertions in their briefs that were not
contained in their SUMF.  The Court does not consider these facts because their
inclusion in Defendants' briefs violates the Court's Local Rules and deprived
Plaintiffs the opportunity to fully respond to the assertions.  <u>See</u> LR 56.1(B)(1)(d)
("The court will not consider any fact . . . set out only in the brief and not in the
movant's statement of undisputed facts.").  The Court notes, however, that it would
have reached the same result even if it considered the improper factual assertions.

[2] The parties dispute Bell's exact schedule.  In her declaration, Cha states that Bell
"worked from 7:00 p.m. to 7:00 a.m. (or 7:30 p.m. to 7:30 a.m.), a 12 hour shift,
five days per week."  (3d Decl. S. Cha [41-4] ¶ 6.)  In her own declaration, Bell
states that she "worked from 7:00pm to 7:30am Sunday through Friday and 7pm to

of answering calls for tows, impounds, and wrecks and then dispatching Nick Group's night shift driver to the scene to perform the tow.  (Id. ¶¶ 8–9.)  Bell answered between five and twenty calls per night, and each call lasted one to two minutes.[3]  (Id. ¶ 8.)  Bell did not clock in and out for her shifts.[4]

The night calls were forwarded to Bell's personal cell phone, allowing Bell to answer the calls from anywhere.  (See id. ¶ 9.)  The parties dispute where Bell was permitted to go during her shifts.  Defendants assert that Cha asked Bell only "to remain in the general area of the Nick Group property" and that Bell could "go to the store, out to eat, or conduct other personal errands."  (Defs.' SUMF [41-1]

---

9am every other Friday/Saturday or 7pm to noon every other Saturday/Sunday for an approximate total of 83.5 hours per week."  (2d Decl. M. Bell [42-3] ¶ 2.)

[3] The parties dispute the average number of calls Bell answered.  Defendants assert that Bell received "an average of approximately 5 to 8 calls," and Plaintiffs assert that "up to 20 calls per night were received during each shift, but usually no less than 5 per night, with an average of 10 to 15 calls per night."  (See Pls.' Resp. Defs.' SUMF [42-1] ¶ 8.)

[4] In their SAMF, Plaintiffs assert that Defendants did not "record or track" Bell's working hours.  (Pls.' SAMF [42-2] ¶ 1.)  Defendants dispute this factual assertion on the ground that it is not supported by the cited evidence.  Plaintiffs cite page 16 of Cha's deposition and an "Exhibit A," described as Defendants' answers to Plaintiffs' interrogatories.  On page 16 of Cha's deposition, Cha explains that she did not pay overtime to Bell because she paid overtime only to employees who clocked in and clocked out.  (Cha Dep. [41-5] at 16.)  This testimony at least supports a reasonable inference that Plaintiffs did not clock in and out for their shifts.  Neither an "Exhibit A" nor interrogatory answers are attached to the parties' filings, and the Court is thus not able to review this cited evidence.

¶¶ 11–12 (citing 3d Decl. S. Cha [41-4] ¶ 7).)  They also contend that Bell "was even allowed to go home during her shift, so long as she did not remain there and was still available to answer the Nick Group calls that were forwarded to her cell phone."  (Id. ¶ 12 (citing 3d Decl. S. Cha [41-4] ¶ 7).)  Plaintiffs assert that Cha required Bell "to either be in the driver's lounge on Nick Group's premises or with a driver at all times."[5]  (Pls.' Resp. Defs.' SUMF [42-1] ¶¶ 11–12 (citing Bell Dep. [41-6] at 45).)[6]

### 2. *Swan's Employment*

From July 2006 to June 2010, Swan was a night shift tow truck driver for

---

[5] The record shows that Bell often chose to ride with the night driver or to answer calls from the company's lounge, which included a sofa, television, shower, and kitchen.  (Id. ¶¶ 12–13.)  The parties agree that, at least in the lounge, Bell was permitted to engage in personal activities, including watching television, using her computer, reading, studying, talking to friends, and caring for her child.  (Id. ¶ 12.)

[6] From August 2006 to December 2008, Bell worked a second job at a Waffle House restaurant.  (See Pls.' Resp. Defs.' SUMF [42-1] ¶ 14.)  Citing Waffle House employment records obtained in discovery, Defendants contend that, on numerous occasions, Bell worked at the restaurant during her Nick Group shift.  (Id. ¶ 14 (citing Decl. M. Cooksey [41-3]).)  In her declaration, Bell disputes this assertion and states that her "shifts at Waffle House never overlapped with [her] shifts at Nick Group."  (See 2d Decl. M. Bell [42-3] ¶ 7, cited in Pls.' Resp. Defs.' SUMF [42-1] ¶ 14.)  The record does not contain information showing Bell's specific hours at Nick Group.

Nick Group.  (Id. ¶ 6.)[7]  Nick Group paid Swan on commission, consisting of 30%

of his tow charges.  (Id.)[8]  Swan did not clock in and out for his shifts.[9]

 In three time periods totaling approximately eighteen weeks—from October

13, 2009, to October 29, 2009, from November 19, 2009, to January 15, 2010, and

from April 15, 2010, to June 15, 2010—the night dispatcher position at Nick

Group was unfilled.  (Id. ¶¶ 15–16.)  During these periods, Swan performed some

of the dispatcher duties.  (Id. ¶ 17.)  He received the calls for tows and responded

to them directly, but he did not prepare log records as a full-time dispatcher would.

(Id. ¶¶ 17–19.)  Although performing dispatcher duties increased the amount of

work Swan was required to perform during his shifts, the additional duties did not

increase the number of hours that Swan worked.  (Id. ¶ 18.)[10]

---

[7] Neither party submits facts showing Swan's hours.  The Court infers that Swan's
hours at least overlapped with, if they were not identical to, Bell's.  (See Defs.'
SUMF [41-1] ¶ 9 (stating that the night driver whom Bell dispatched "was usually
Swan").)

[8] The record does not show the amount of any of Swan's commissions.

[9] As with Bell, Plaintiffs assert that Defendants did not "record or track" Swan's
working hours, and Defendants dispute this assertion as unsupported.  (Pls.' SAMF
[42-2] ¶ 1; Defs.' Resp. Pls.' SAMF [44] ¶ 1.)  As discussed above, the cited
evidence at least supports a reasonable inference that Plaintiffs did not clock in and
out for their shifts.

[10] Plaintiffs purport to dispute Defendants' assertion that the dispatcher duties "did
not increase [Swan's] hours of work."  (See Pls.' Resp. Defs.' SUMF [42-1] ¶ 18.)

### 3. *Nick Group's Interstate Activities*

Nick Group is registered as a "motor carrier" with the Motor Carrier Division of the Georgia Department of Revenue and the United States Department of Transportation ("DOT").  (Id. ¶ 3.)[11]  Nick Group frequently tows vehicles that have been driven across state lines and have out-of-state license plates.  (Id. ¶ 5.)[12] Nick Group drivers are "subject to being assigned, and have in fact been assigned to tow cars between Georgia and another state, across state lines."  (Id. ¶ 4.)[13]

They cite paragraph 3 of Swan's declaration and page 40 of Swan's deposition.  In paragraph 3 of the declaration, Swan states only the dates on which he performed dispatcher duties.  (Decl. G. Swan [42-4] ¶ 3.)  On page 40 of his deposition, Swan states only that performing dispatcher duties increased his overall job responsibilities.  (Swan Dep. [41-7] at 40.)  On the next page, Swan concedes that his hours stayed the same.  (Id. at 41.)  The Court finds that it is undisputed that Swan's work hours did not increase when he performed dispatcher duties.

[11] Plaintiffs dispute Defendants' assertion that Nick Group is registered with DOT because Defendants cite only Georgia Department of Revenue applications to support the assertion.  (See Pls.' Resp. Defs.' SUMF [42-1] ¶ 3.)  The cited applications contain Nick Group's DOT "number."  (See Decl. S. Cha attach. 1 [41-4] at 9, 14–16, 18–19.)  The Court finds that, on this basis, the applications support DOT registration, but notes, as discussed below, that this registration alone is not material to Defendants' Motion for Summary Judgment.

[12] The record before the Court does not otherwise describe these out-of-state vehicles or provide any information on whether the vehicles were in the process of moving interstate at the time of towing.

[13] The record before the Court does not specify whether all Nick Group drivers, including night drivers like Swan, were "subject" to make interstate tows.  To support its assertion, Defendants cite Cha's declaration, in which she states, "Nick

## II.   DISCUSSION

### A.   Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State

---

Group drivers are subject to being towed across state lines . . . ."  (Defs.' SUMF [41-1] ¶ 4; Decl. S. Cha [41-4] ¶ 10.)  In the same paragraph, Cha also states, "*All* Nick Group drivers frequently tow vehicles that have been driven across state lines . . . ."  (Decl. S. Cha [41-4] ¶ 10 (emphasis added).)  The Court finds that this ambiguity could support that "all" drivers towed out-of-state vehicles but only "some" drivers made interstate tows.

Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings."  Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)).  "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

B.    Analysis

Defendants seek summary judgment in their favor on (i) Plaintiffs' overtime compensation claims on the ground that Defendants are exempt from the FLSA's overtime requirements under the "Motor Carrier Act Exemption"; (ii) all of Swan's claims on the ground that the record does not establish that Swan was denied

minimum wage or worked more than forty hours per week; (iii) all of Bell's claims on the ground that the record does not establish that Bell was denied minimum wage or that Bell worked more than forty hours per week; and (iv) Plaintiffs' claims that accrued more than two years before the filing of this action and Plaintiffs' claims for liquidated damages on the ground that the record shows that Defendants did not commit "willful" violations of the FLSA.

        1.    *Motor Carrier Act Exemption*

The FLSA exempts from its overtime pay requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the Motor Carrier Act ("MCA"). 29 U.S.C. § 213(b)(1) (2006); accord Abel v. S. Shuttle Servs., Inc., 631 F.3d 1210, 1212 (11th Cir. 2011) (per curiam); Walters v. Am. Coach Lines of Miami, Inc., 575 F.3d 1221, 1226 (11th Cir. 2009) (per curiam). This exemption (the "MCA Exemption") exists "to eliminate any conflict between the jurisdiction exercised by the Department of Labor . . . over the FLSA and the mutually exclusive jurisdiction exercised by the [Department of Transportation] over the MCA." Walters, 575 F.3d at 1226 (citing Spires v. Ben Hill County, 980 F.2d 683, 686 (11th Cir. 1993)). "[T]he Secretary of Transportation does not have to exercise the authority granted to him by the MCA

for the [MCA Exemption] to be applicable; instead, his power to regulate under the act merely needs to cover a particular group of employees." Id. (citing Spires, 980 F.2d at 686).

The applicability of the MCA Exemption "depends both on the class to which [the] employer belongs and on the class of work involved in the employee's job." Walters, 575 F.3d at 1227 (quoting 29 C.F.R. § 782.2(a)). There are two requirements for an employee to be subject to the MCA Exemption: (1) "his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA"; and (2) "the employee's business-related activities must directly affect the safety of operation of motor vehicles in transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the [MCA]." Abel, 631 F.3d at 1213 (quoting Walters, 575 F.3d at 1227). The employer has the burden to show that the MCA Exemption's requirements are satisfied, and the Court construes the MCA Exemption narrowly against the employer. Id. at 1212; Walters, 575 F.3d at 1226.

To qualify for the MCA Exemption, Nick Group first must show that it is "subject to the Secretary of Transportation's jurisdiction under the MCA." Abel, 631 F.3d at 1213 (quoting Walters, 575 F.3d at 1227). To do this, Nick Group must demonstrate that it is a "common carrier by motor vehicle," that its "activities

directly affect the safety of operations of such motor vehicles," and that it is "engaged in interstate commerce."  See id. (quoting Walters, 575 F.3d at 1226–27); see also 49 U.S.C. §§ 13501(1)(A), 31502(a)(1), (b)(1) (2006).  The parties dispute only the last element, whether Nick Group is "engaged in interstate commerce."

Nick Group argues that it is engaged in interstate commerce because (i) its business includes towing cars from Georgia to other states and (ii) its drivers often tow, within Georgia, vehicles in the process of moving in interstate commerce. The record before the Court does not support Nick Group's contentions.

i.   Interstate Towing

Defendants first argue that Nick Group's interstate towing business is sufficient to show that it is engaged in interstate commerce.  Plaintiffs do not dispute that interstate towing is interstate commerce, but argue that the quantity of Nick Group's interstate towing is not sufficient.  The parties agree that a carrier generally must engage in more than *de minimis* interstate commerce to fall under MCA jurisdiction.[14]  The record does not contain any data showing the quantity of

---

[14] In Morris v. McComb, 332 U.S. 422 (1947), the Supreme Court held that a carrier was subject to MCA jurisdiction when 3.65% of its total trips and 4% of its revenue were derived from "interstate commerce."  332 U.S. at 433–34.  Based on the Supreme Court's consideration of the quantity of the carrier's interstate activities, many lower courts subsequently have imposed a requirement that a

Nick Group's interstate towing or the revenue Nick Group derives from interstate towing, and the Court is not able to determine whether Nick Group's interstate towing is more than *de minimis*.[15]

Citing <u>Walters</u>, Nick Group argues that it is not required to show that its interstate towing is more than *de minimis* because it has a DOT registration number.  In <u>Walters</u>, the carrier-employer derived over four percent of its revenue from interstate trips, and it "was licensed by the DOT" *and* had "authorizations necessary to be an interstate motor carrier" issued by the Federal Motor Carrier Safety Administration ("FMCSA").  575 F.3d at 1227–28.  The court noted that, in situations "where the company has the appropriate federal licensing and there is

---

carrier's interstate activities be more than *de minimis* for MCA jurisdiction to obtain.  <u>See</u> <u>Walters</u>, 575 F.3d at 1227–28; <u>see also</u> <u>Turk v. Buffets, Inc.</u>, 940 F. Supp. 1255, 1261–62 (N.D. Ill. 1996) (collecting cases).  The Eleventh Circuit has not expressly adopted this *de minimis* rule, but the Circuit consistently has applied it where the parties agree to its application.  <u>See</u> <u>Abel</u>, 631 F.3d at 1213 & n.4; <u>Walters</u>, 575 F.3d at 1227–28.  In doing so, the Eleventh Circuit has stated that the *de minimis* standard is satisfied if more than one percent of a carrier's trips consist of, or more than one percent of its revenue is derived from, interstate activities. <u>See</u> <u>Walters</u>, 575 at 1228.  Because the parties do not challenge the general applicability of the *de minimis* standard (as discussed below, Defendants argue that they qualify for an "exception" to the requirement), the Court assumes here that it generally applies.  <u>See</u> <u>id.</u>

[15] Defendants appear to concede that Nick Group's interstate towing is not more than *de minimis*.  Although not included in the parties' statements of facts, Cha stated in a declaration that "less than 1%" of Nick Group's revenue is derived from interstate towing.  (<u>See</u> 3d Decl. S. Cha [41-4] ¶ 10.)

undisputed proof of some transportation that crosses state lines," the *de minimis* requirement may not be applicable.  Id. at 1228.  The court found, however, that the carrier's interstate revenue was sufficient to satisfy the *de minimis* requirement. Id.

Assuming that "appropriate federal licensing" is an exception to the *de minimis* requirement, Defendants here have failed to show that Nick Group has or, at the time of Plaintiffs' employment, had such licensing.  Unlike the carrier-employer in Walters, Nick Group has not shown that it has FMCSA authorization to be an interstate carrier.  The record before the Court shows only that Nick Group "is registered" with DOT.  (Defs.' SUMF [41-1] ¶ 3.)  Even assuming that Nick Group had this registration during the relevant time periods, Defendants have not cited, and the Court is not aware of, any authority that DOT registration alone constitutes authorization to engage in interstate carriage.[16]  The Court finds that

---

[16] Georgia, in fact, is one of several states that requires DOT registration by wholly *intrastate* carriers.  See FMCSA, *What is a USDOT Number?*, http://www.fmcsa.dot.gov/registration-licensing/registration-USDOT.htm (last visited Sept. 6, 2013); see also D'Arpa v. Runway Towing Corp., No. 12-cv-1120, 2013 WL 3010810, at *10 (E.D.N.Y. June 18, 2013) (finding that DOT registration by a New York tow company was not sufficient to show engagement in interstate commerce because New York, like other states, requires DOT registration by its intrastate carriers).  In their brief, but not in their SUMF, Defendants refer to Nick Group's Georgia Department of Revenue registration applications to support their contention that Nick Group has federal interstate licensing.  Although these documents are not properly before the Court, see LR 56.1(B)(1)(d), the Court notes

Defendants have not met their burden to show that Nick Group's interstate towing is sufficient to place Nick Group under the jurisdiction of the MCA.

    ii.  Towing Out-of-State Vehicles

   Defendants next argue that Nick Group's frequent towing of out-of-state vehicles, as shown only by its towing of vehicles with non-Georgia license plates, is sufficient to show that it is engaged in interstate commerce.  "When persons or goods move from a point of origin in one state to a point of destination in another, the fact that a part of that journey consists of transportation by an independent agency solely within the boundaries of one state does not make that portion of the trip any less interstate in character."  Walters, 575 F.3d at 1229 (quoting United States v. Yellow Cab Co., 332 U.S. 218, 228 (1947), overruled on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984)).  "As a result, purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.'"  Id. (quoting Chao v. First

---

that the applications are for the registration only of vehicles "that travel entirely in intrastate commerce in Georgia."  (See 3d Decl. S. Cha attach. 1 [41-4] at 10–14.) These applications not only fail to demonstrate that Nick Group has federal interstate licensing but also affirmatively support that Nick Group may not be engaged in more than *de minimis* interstate commerce.  See D'Arpa, 2013 WL 3010810, at *10–11 (finding that employer-carrier was not engaged in interstate commerce because its DOT records indicated that it was registered as "intrastate only").

Class Coach Co., 214 F. Supp. 2d. 1263, 1272 (M.D. Fla. 2001)).  A "continuous stream" exists where there is "'practical continuity of movement' between the intrastate segment and the overall interstate flow." Id. (quoting Walling v. Jacksonville Paper Co., 317 U.S. 564, 568 (1943)).

In Walters, the Eleventh Circuit considered a shuttle bus company whose business included picking up passengers from the airport and transporting the passengers to cruise ship terminals. Id. at 1224.  The passengers arrived at the airport from out-of-state points of origin, and they were bound for cruises to out-of-state destinations. Id.  The court found that the shuttle bus operator was engaged in interstate commerce because its airport-to-seaport service constituted a component of the passengers' continuous interstate travel. Id. at 1230.  Similarly, in Baez v. Wells Fargo Armored Service Corp., 938 F.2d 180 (11th Cir. 1991) (per curiam), the court held that armored truck guards, who transported currency bound for out-of-state banks, were engaged in interstate commerce because their services formed part of the continuous interstate transportation of the currency.  938 F.2d at 182 (citing Opelika Royal Crown Bottling Co. v. Goldberg, 299 F.2d 37, 43 (5th Cir. 1962)).

The record here does not show that Nick Group performed towing services that formed "part of a continuous stream" of interstate transportation of vehicles.

The record shows, at most, that Nick Group towed vehicles that once had been outside of Georgia.  Unlike in Walters and other cases finding intrastate transportation to be a component of a larger, interstate network, there is no evidence here that any of the towed vehicles were in the process of being transported interstate at the time of Nick Group's towing.  And there is no evidence that, even if the vehicles were being transported interstate, Nick Group's towing was a component of the transportation, rather than a brief, unexpected interruption in the intended interstate transportation.[17]  The Court finds the record is not sufficient to show that Nick Group's intrastate towing was "part of a continuous stream" of interstate transportation of vehicles.

Having found that the record does not support that either Nick Group's interstate towing or its towing of out-of-state vehicles is sufficient to qualify as interstate commerce under the MCA, the Court concludes that Defendants have not met their burden to establish the applicability of the MCA Exemption.[18]

_____

[17] Defendants appear to ask the Court simply to infer that vehicles with out-of-state license plates are being moved in interstate commerce.  In evaluating Defendants' Motion for Summary Judgment, the Court is required to view the evidence in the light most favorable to Plaintiffs and to draw inferences in favor of Plaintiffs, not Defendants.  See Garczynski, 573 F.3d at 1165.

[18] Because the record does not support that Nick Group itself is subject to the jurisdiction of the Secretary of Transportation under the MCA, the Court does not reach the second requirement of the MCA Exemption—that Plaintiffs' business-

Defendant's Motion for Summary Judgment on the MCA Exemption is denied.[19]

2.      *Swan's Claims for Compensation as a Dispatcher*

Defendants move for summary judgment on Swan's claims for minimum wage and overtime on the ground that he is entitled to additional compensation for dispatcher work that he performed while he was also on duty as a driver.  Plaintiff responds only that Swan was not paid separately for his dispatcher work.  The FLSA imposes minimum wage and overtime compensation requirements for *hours* worked.  See generally 29 U.S.C. §§ 206–207.  The Act does not limit the *duties* an employer may assign or otherwise impose compensation requirements based on duties assigned to an employee.  Defendants are entitled to summary judgment on Swan's claims that he is entitled to additional compensation for the dispatcher

related activities "directly affect the safety of operation of motor vehicles in transportation on the public highways of passengers or property in interstate or foreign commerce."  The Court notes that, for the same reasons the record does not show interstate commerce by Nick Group, the record does not support that either Plaintiff engaged in interstate commerce for Nick Group.  The Court further notes that, even if Nick Group's minimal interstate towing were sufficient to constitute interstate commerce, the record does not contain evidence that Swan, a night driver, and Bell, a night dispatcher, would have been expected to have any involvement with interstate towing.

[19] Although there is insufficient evidence at this stage of the litigation to show that the MCA Exemption applies, Defendants may seek to introduce evidence at trial to support application of the exemption.

work he performed while also working as a driver.[20]

3.    *Bell's Claims*

Defendants move for summary judgment on Bell's claims on the ground that the majority of Bell's alleged working time consisted of non-compensable on-call "waiting time."  Whether an employee's time spent "wait[ing] for the employer's call to duty" is compensable under the FLSA "depends on the degree to which the employees may use the time for personal activities."  Birdwell v. City of Gadsden, 970 F.2d 802, 807 (11th Cir. 1992) (citing Skidmore v. Swift & Co., 323 U.S. 134, 136, 138 (1944)).  "This question has been formulated as whether 'the time is spent predominately for the employer's benefit or for the employee's,'" and it is "dependent upon all the circumstances of the case."  Id. (quoting Skidmore, 323 U.S. at 136; Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944)).

In Armour, the Supreme Court considered private firefighters working for a

---

[20] The parties dispute whether Swan has any remaining claims.  In their Amended Complaint, Plaintiffs allege that, in certain weeks, Swan worked more than forty hours as a dispatcher and that he was not paid overtime compensation.  (See Am. Compl. [39] ¶¶ 24, 26, 33.)  Although the record before the Court shows that Swan did not work additional hours as a dispatcher (Defs.' SUMF [41-1] ¶ 18), the record does not show that Swan's total work hours, as a driver-dispatcher, did not exceed forty per week or that he was compensated either at the minimum wage or for overtime hours.  Swan's claims for minimum wage and for overtime based on weeks in which he worked more than forty hours remain pending.  The claims are limited to Swan's total hours of work, regardless of his specific function during any of the worked hours.

soap factory.  323 U.S. at 127.  The firefighters were required to remain on the factory premises overnight and to be ready to respond in the unlikely event of a fire.  Id. at 133–34.  They were otherwise free to eat, sleep, and entertain themselves.  Id.  The Court found that the restrictions on the firefighters' liberty— that they were not free to leave the premises—showed that their overnight time was "predominantly for the employer's benefit" and therefore was compensable under the FLSA.  Id.

In Birdwell, the Eleventh Circuit considered police detectives who, while officially off-duty, were required to remain "prepared to report to work immediately" if called in.  970 F.2d at 804.  The detectives were required to remain near a telephone at all times, or carry a pager, and they could not "leave town, drink, or use any compensatory time."  Id.  The court found that the detectives' on-call time was not compensable because they "could do anything they normally did so long as they were able to respond to a call promptly and sober."  Id. at 810.  The court held that "an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA."  Id.

In reaching its decision in Birdwell, the Eleventh Circuit relied on the Fifth Circuit's decision in Halferty v. Pulse Drug Co., 864 F.2d 1185 (5th Cir. 1989). Id. at 809.  In Halferty, an overnight telephone dispatcher for a nonemergency

ambulance company answered calls at home for the company.  864 F.2d at 1187.

The dispatcher could leave her home so long as the calls were forwarded or if

someone answered them for her.  Id.  The court held that, because the dispatcher

could "visit friends, entertain guests, sleep, watch television, do the laundry, and

babysit," she was using the time predominately for her own benefit and her time

waiting for calls was not compensable.  Id. at 1189.

These cases make clear that a key factor in evaluating waiting time is the

degree to which the employee is free to come and go.  See Armour, 323 U.S. at

133–34; Birdwell, 970 F.2d at 1189; Halferty, 864 F.2d at 1189.  The record here

shows a dispute over Bell's freedom to come and go from Nick Group's premises

and engage in personal activities.  Bell was allowed to, and did, ride with the night

drivers and go to dinners at nearby restaurants with other Nick Group employees.

Cha states that Bell could also go home during her shifts, "so long as she did not

remain there and was still available to" answer dispatch calls.  (3d Cha Decl. ¶ 7.)

Bell testified that she was not permitted to go home and that Cha required her to

remain either on Nick Group's premises or with a Nick Group driver.  (Bell Dep.

[41-6] at 45.)[21]  There is also a dispute as to whether Bell worked at her second job

---

[21] Although not in the record properly submitted to the Court, the Court notes that, in her deposition, Bell conceded that there were at least some occasions when she stopped at her house while she was on duty.  (See Bell Dep. [41-6] at 46–47.)

during her Nick Group shifts.  The Court finds that these disputes, over Bell's ability to go home and to engage in other employment, are material and preclude the entry of summary judgment.  Defendants' Motion for Summary Judgment on Bell's claims is denied.[22]

### 4.   *Whether Defendants "Willfully" Violated the FLSA*

Defendants move for summary judgment on Plaintiffs' claims that accrued more than two years before the filing of this action and on Defendants' liability for liquidated damages.  Defendants argue that (i) the record does not support that they "willfully" violated the FLSA, thus precluding the application of a period of limitations in excess of two years, and (ii) the record establishes that Defendants reasonably acted in "good faith" with regard to Plaintiffs' pay, thus entitling Defendants to the "good faith" defense to liquidated damages.

### i.   Period of Limitations

The period of limitations for FLSA claims is generally two years.  Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1162 (11th Cir. 2008) (citing 29 U.S.C. § 255(a)).  The period is extended to three years for claims

---

[22] Defendants also argue that Bell has "abandoned" her minimum wage claims. Plaintiffs argue that Bell's flat rate of pay—$390 per week—does not satisfy either the minimum wage or overtime pay requirements of the FLSA.  Both claims turn on whether Bell's waiting time is compensable.  The Court finds that Bell has not abandoned her minimum wage claim, and it remains pending.

"arising out of a willful violation" of the Act.  Id. (quoting 29 U.S.C. § 255(a)).  To qualify for the longer period, the employee must prove, by a preponderance of the evidence, that "his employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was."  Id. at 1162–63.  The employee satisfies his burden if he shows that the employer "should inquire as to whether his actions violate the [FLSA], but fails to do so."  See Davila v. Menendez, 717 F.3d 1179, 1184–85 (11th Cir. 2013); see also 29 C.F.R. § 578.3(c)(3) ("[A]n employer's conduct shall be deemed to be in reckless disregard of the requirements of the Act, among other situations, if the employer should have inquired further into whether its conduct was in compliance with the Act, and failed to make adequate further inquiry.").

The record here shows that Cha, a Korean immigrant, is not a native speaker of English, and it contains testimony by Cha that she was not aware that Nick Group "might not be in compliance" with the FLSA.  (See Defs.' Br. [41] at 21; Defs.' SUMF [41-1] ¶ 21.)  The record also shows that Defendants paid overtime to other employees and that Defendants did not require Plaintiffs to clock in and out.  (S. Cha Dep. [41-5] at 16.)

This record is similar to one recently considered by the Eleventh Circuit in Davila.  See 717 F.3d at 1185.  In that case, the employers stated that they did not

23

have knowledge of their obligations under the FLSA, but the record showed that the employers were aware of the relevant wage and hour laws and did not investigate whether they had complied with the laws.  Id.  The record further showed that the employers did not sign an employment contract with the employee, did not record the employee's working hours, and paid the employee cash.  Id.  The court concluded that a reasonable jury could have found the employers' violation to be willful.  Id.

The Court concludes that a reasonable jury could find a willful violation by Defendants here.  See id.  Although Cha maintains that she lacked knowledge of her FLSA obligations, the fact that Defendants paid overtime to some employees, coupled with Defendants' decision not to require Plaintiffs to record their hours, is sufficient for a reasonable jury to conclude that Cha was aware of the FLSA and chose not investigate its applicability to Plaintiffs.  See id.  Defendants' Motion for Summary Judgment on the three-year statute of limitations is denied.

ii.    Liquidated Damages

An employer who violates the FLSA generally is liable to the employee in the amount of unpaid compensation and in an equal amount as "liquidated damages."  Id. at 1163 (quoting 29 U.S.C. § 216(b)).  Under the "good faith" defense, however, the district court has discretion "to reduce or deny an award of

liquidated damages 'if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation'" of the FLSA.  Id. (quoting 29 U.S.C. § 260).  The employer has the burden of establishing the requirements of the "good faith" defense.  Id.

In cases where a jury has determined that a defendant committed a "willful" violation of the FLSA, for purposes of the three-year period of limitations, the defendant is precluded from seeking the "good faith" defense to liquidated damages because "willfulness" and "good faith" are mutually exclusive.  See id. at 1186; Alvarez Perez, 515 F.3d at 1166.  Where there is sufficient evidence from which a jury could find a "willful" violation, the district court is "required to await the finding of the jury about willfulness" before making a determination as to "good faith" in the context of liquidated damages.  Davila, 717 F.3d at 1186. Because the Court here has determined that a jury must determine the willfulness of Defendants' alleged FLSA violations, the Court must await the jury's determination before considering the "good faith" defense.  Defendants' Motion for Summary Judgment on liquidated damages is required to be denied.

### III.    CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Renewed Motion for Summary Judgment [41] is **GRANTED IN PART** and **DENIED IN PART**.  It is **GRANTED** with respect to Swan's claims for compensation as a dispatcher during the times in which he was also on duty as a driver.  It is **DENIED** with respect to all remaining claims.

**SO ORDERED** this 12th day of September, 2013.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE